824 A.2d 251 (2003)
361 N.J. Super. 106
Kayhan DONG, Plaintiff-Appellant,
v.
Michael T. ALAPE, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 18, 2002.
Decided June 9, 2003.
*253 William S. Winters, argued the cause for appellant.
Robert S. Helwig, New Brunswick, argued the cause for respondent (Hoagland, Longo, Moran, Dunst & Doukas, attorneys; Mr. Helwig, of counsel; J. Silvio Mascolo, on the brief).
William M. Dellicato, for amicus curiae Mothers Against Drunk Driving.
Before Judges KING, LISA and FUENTES.
*252 The opinion of the court was delivered by LISA, J.A.D.
We consider in this appeal whether plaintiff, who was injured by an allegedly intoxicated hit-and-run driver, presented sufficient evidence to warrant submission of a punitive damages claim to the jury. After conducting a pre-trial N.J.R.E. 104(a) hearing, the trial judge concluded that, although evidence existed that defendant consumed some alcohol prior to the accident, there was insufficient credible, admissible evidence from which a jury could find that defendant was intoxicated at the time of the accident. He further found an absence of aggravating factors which would justify submission to the jury of a punitive damages claim. The judge *254 dismissed plaintiff's count for punitive damages.
We also address a discovery violation asserted by plaintiff. Defendant admitted liability, and the compensatory claim was tried as to damages only. Defendant was permitted to play, over plaintiff's objection, a surveillance videotape of plaintiff that had not been disclosed prior to trial despite plaintiff's discovery demand. The jury awarded plaintiff $70,000.[1] Plaintiff is dissatisfied with the compensatory award and claims he was prejudiced by the non-disclosure of the videotape prior to trial.
Plaintiff's motion for a new trial on both compensatory and punitive damages was denied, and he now appeals. We reverse on both issues and remand for a new trial.

I
We first address the punitive damages issue. Our analysis is guided by summary judgment principles,[2] the ultimate issue being "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). On appeal, we apply the same standard as the trial court. Prudential Property & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App. Div.1998). All legitimate inferences must be drawn in favor of the non-moving party. R. 4:46-2(c). In this context, we must determine whether plaintiff has made out a prima facie case of entitlement to punitive damages.

A.
Viewing the evidential materials most favorably to plaintiff, these are the facts. On January 12, 1998, at about 5:00 p.m., the seventeen-year-old plaintiff and his two friends were attempting to cross Woodbridge Avenue in Edison. They were not at an intersection. The area is residential. Rush hour traffic was heavy. Woodbridge Avenue has one lane in each direction, separated by a double yellow line at this location. A car stopped to allow the boys to cross, and they entered the roadway in front of that car from its right.
Defendant was driving behind the car that stopped. Defendant crossed the double yellow line, passed the stopped car, and cut back into the right lane. One of the boys successfully jumped back, and another boy also avoided being hit. Defendant struck plaintiff, however, with the right front portion of his car, propelling plaintiff into the air, striking and smashing the right side of defendant's windshield, and vaulting over the car.
Three eyewitnesses testified at the N.J.R.E. 104(a) hearing: Robert Ellmyer, who was standing on his front yard adjacent to the point of impact; Sherine Heikal, *255 a limousine driver proceeding in the same direction as defendant and directly behind him at the time of impact; and Eugene Yu, the friend of plaintiff who successfully jumped out of defendant's path. These three witnesses, all of whom are independent of each other and two of whom are independent of plaintiff, estimated defendant's speed to be excessive at the time of impact. Heikal and Yu said defendant was going about fifty miles per hour, and Ellmyer estimated defendant's speed at forty to fifty miles per hour. The posted speed limit is thirty-five miles per hour.[3]
After impact, defendant continued driving without immediately slowing down. He approached a red light, where several vehicles were stopped. Defendant stopped in this line of traffic. Heikal had stopped and exited his vehicle at the accident scene. He and plaintiff's other friend, Juan Andino, pursued defendant's vehicle on foot. They caught up to it while stopped in traffic at the red light. Defendant's windows were closed. Heikal went to the driver's side window and Andino to the passenger's side.
Heikal banged on the window, yelling to defendant more than once that he "just hit a kid." Andino was yelling from the passenger side, "You just hit my friend. You just hit my friend." Heikal described defendant's reaction: Defendant "just looked at me like, you know, it was like he was in a different world and he couldn't understand what I'm saying" "He just looked at me and smiled." "When I talked to him, sir, he seemed to me in a different world. He wasn't there. He wouldn't understand what I'm saying. All his cheeks were very, very red and his eyes was completely red. And his head was like, you know, moving around like it's not stable as a normal person driving a car." Defendant also looked at Andino, making no response.[4] When the light turned green and traffic began to move, defendant drove away. He left the scene. Heikal made note of defendant's license plate number and gave it to the police.
Heikal had observed defendant's driving for about a quarter of a mile before the accident. He described how defendant used a left-turn-only lane while approaching an intersection to pass a line of cars in the straight-only lane. Defendant's car "was skidding a little bit and then he just cut off in the front of us." Although the heavy rush hour traffic was moving along at about twenty-five to thirty miles per hour, defendant was passing other cars, reaching speeds of "at least 50" miles per hour. Heikal was directly behind defendant when he saw the car in front of defendant braking. Instead of slowing down and stopping behind that vehicle, defendant, traveling at about fifty miles per hour, completely crossed the double yellow line, passed the vehicle, and then, as he cut back into the right lane, struck plaintiff.
Defendant was identified through Division of Motor Vehicle records and located *256 the next day at his home in Piscataway Township at about 1:00 p.m. Piscataway Officer Douglas Zuber went to defendant's home and observed the damaged car in front of the house. From his observations, Zuber believed defendant to be intoxicated at that time. Defendant admitted to drinking that morning. When Zuber informed defendant of the purpose of his visit, defendant said he did not remember having an accident or hitting anyone the previous day. Defendant told Zuber he sometimes blacks out. Zuber was concerned for defendant's safety, because defendant appeared intoxicated, was home alone, and stated he suffers from blackouts. At Zuber's direction the local ambulance squad was called and it transported defendant to a hospital. The Edison police arrived and had defendant's car towed.
Although defendant has steadfastly denied any recollection of the accident, he does not deny that he was the driver of his car which struck plaintiff. He pled guilty in municipal court to charges of careless driving, N.J.S.A. 39:4-97, and failure to report an accident, N.J.S.A. 39:4-130. These pleas were entered without a reservation that they could not be used against defendant in a civil action. R. 7:6-2(a)(1).
Defendant has a history of alcoholism, which predates the accident by at least three years. He was twice admitted to the Carrier Clinic before the accident for alcoholism and depression. On the day after the accident, defendant gave a statement to Edison Township Officer S. Miller:
He stated that he does not remember being in Edison or even driving his car.... He stated he has a drinking problem and drank from 11:00 AM till when he blacked out but does not remember when. He does not remember anything that happened during [January 12, 1998]. He stated that he is also on medication for depression which he took with the alcohol.
In his testimony at the N.J.R.E. 104(a) hearing, defendant stated he did not believe he blacked out on the date of the accident. He was unemployed. He admits drinking three or four beers that morning while working on his car. He contends he came in the house about noon and, at 3:00 p.m., he picked up his ten-year-old daughter from school and returned home. He then laid down on the couch and does not remember anything until the next morning. He could not say whether he drank any more that afternoon. His reason for not remembering is that he was drinking.
Defendant acknowledged seeking medical assistance for his drinking problem from his general practitioner prior to the accident. The doctor told him he was clinically depressed and was self-medicating with alcohol. Defendant would self-medicate with alcohol when he was unemployed. He admitted to self-medicating in that manner from "Christmastime through January [1998] and I became employed February 1st." Defendant further described a blackout resulting from excessive alcohol consumption in October 1997 because he lost his job and learned he was not eligible for unemployment benefits. On that occasion, defendant admitted drinking himself "into oblivion." According to defendant, his reason for drinking during this time period was his unemployed status. Defendant stated he would typically drink twelve to eighteen beers per day. In addition, he drank vodka. Although he denied drinking that much on the date of the accident, he could not recall how much he did drink.
Defendant further acknowledged he was taking either Depakote or Paxil for depression. He does not recall whether his prescription was changed before or after the accident. He denies being advised *257 by his physician not to mix the medication with alcohol. He admitted he has since become aware of such restrictions "[b]ecause now I read the piece of paper that comes inside the bag with the prescription each time."

B.
A defendant's conduct must be particularly egregious to support an award of punitive damages. "To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an `evil-minded act' or an act accompanied by a wanton and wilful disregard of the rights of another." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984) (citing DiGiovanni v. Pessel, 55 N.J. 188, 191, 260 A.2d 510 (1970)).
Something more than the mere commission of a tort is always required. There must be circumstances of aggravation or outrage, which may consist of such a conscious and deliberate disregard of the interests of others that the tortfeasor's conduct may be called wanton and willful. Lacking this element, mere negligence, however gross, is generally held not to be enough. Nappe, supra, 97 N.J. at 50, 477 A.2d 1224 (citing Giovanni, supra, 55 N.J. at 190, 260 A.2d 510) (quoting W. Prosser, Handbook on the Law of Torts § 2, at 9-10 (2d ed. 1955)). A plaintiff must demonstrate a "deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962).
"The defendant, however, does not have to recognize that his conduct is `extremely dangerous,' but a reasonable person must know or should know that the actions are sufficiently dangerous." Parks v. Pep Boys, 282 N.J.Super. 1, 17, 659 A.2d 471 (App.Div.1995) (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 306, 266 A.2d 284 (1970)). Willful and wanton misconduct signifies something less than an intention to hurt. McLaughlin, supra, 56 N.J. at 306, 266 A.2d 284. The standard can be established if the defendant knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct. Ibid.
With the adoption in 1995 of the Punitive Damages Act (PDA), N.J.S.A. 2A:15-5.9 to -5.17, the Legislature essentially codified these common law principles. See Smith v. Whitaker, 160 N.J. 221, 242-46, 734 A.2d 243 (1999). The statutory standard of proof is:
Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
[N.J.S.A. 2A:15-5.12a.]
"Punitive damages" are defined as those awarded "because of aggravating circumstances in order to penalize and to provide additional deterrence against a defendant to discourage similar conduct in the future." N.J.S.A. 2A:15-5.10. "`Actual malice' means an intentional wrongdoing in the sense of an evil-minded act." Ibid. "`Wanton and willful disregard' means a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the *258 consequences of such act or omission." Ibid.
In his punitive damages count, plaintiff does not allege actual malice. He alleges that defendant's conduct exhibited a wanton and willful disregard of persons who foreseeably might be harmed. He argues that he has presented sufficient evidence to enable a jury to rationally find, by clear and convincing evidence, that defendant was intoxicated, that his intoxication was a cause of the accident, and that sufficient aggravating circumstances were present to support a punitive damages award. We agree that a prima facie case is established, warranting submission of this issue to the jury.
We initially note that intoxication is not a prerequisite to a punitive damages claim arising out of a motor vehicle accident. See, e.g., Smith, supra, 160 N.J. at 221, 734 A.2d 243 (affirming punitive damages award against commercial truck owner that allowed operation of its truck for one month, knowing it had defective brakes, which was a cause of the accident). Conversely, a defendant's intoxication, standing alone, is not sufficient to support a punitive damages award. McMahon v. Chryssikos, 218 N.J.Super. 571, 528 A.2d 104 (Law Div.1986).
In McMahon, decided before the adoption of the PDA, Judge Conley canvassed decisions in other jurisdictions and found that most states that have considered the issue allow a jury to consider imposition of punitive damages when a defendant becomes voluntarily intoxicated and then operates a motor vehicle. Id. at 575, 528 A.2d 104. Some states have adopted a per se rule, allowing punitive damages based on intoxication alone, while others require an additional showing of aggravating circumstances. Ibid. Judge Conley found the latter approach to be consistent with New Jersey's punitive damages jurisprudence. Id. at 579, 528 A.2d 104.
The well-reasoned rationale of McMahon gains added support from the provisions of the PDA. The legislation evinces a pervasive legislative intent to curb, rather than expand, the availability of punitive damages. See Smith, supra, 160 N.J. at 245-46, 734 A.2d 243. The legislative history reflects this intent:
This bill is intended to limit the use and amount of punitive damages which may be awarded in a lawsuit. The awarding of punitive damages was originally intended to punish defendants for malicious or wanton actions and to deter others from engaging in similar activities. However, many persons believe that in recent years these damages have been awarded indiscriminately for actions that are merely careless. This has increased the number of punitive damage claims and contributed to the high cost of litigation.
[Sponsor's Statement, Senate No. 1496, Introduced October 3, 1994.]
To accomplish this purpose, the PDA codifies the need for clear and convincing evidence and the requirement that no degree of negligence, including gross negligence, can satisfy the burden of proof. N.J.S.A. 2A:15-5.12a. It requires consideration of specified factors to determine whether to award punitive damages, N.J.S.A. 2A:15-5.12b, and specifies guidelines for determining the amount of a punitive award, N.J.S.A. 2A:15-5.12c. The Act requires a compensatory award as a prerequisite and precludes punitive damages supported only by an award of nominal damages. N.J.S.A. 2A:15-5.13c. Judges are authorized to reduce or eliminate unreasonable punitive awards. N.J.S.A. 2A:15-5.14a.
Most significantly, the Legislature has imposed a cap on punitive awards. *259 N.J.S.A. 2A:15-5.14b. We are, of course, mindful that the cap has certain exceptions, including where a defendant has been convicted[5] of driving while intoxicated, N.J.S.A. 39:4-50, or refusing to submit to a breathalyzer test, N.J.S.A. 39:4-50.4a. The Legislature's decision not to cap the amount of punitive damages in drunk driving cases, however, does not signal a lessening of the standard for entitlement to recover punitive damages. Finally, the PDA expressly provides that nothing in it should "be construed as creating any claim for punitive damages which is not now available under the law of this State." N.J.S.A. 2A:15-5.15.
We reject any suggestion that we should adopt a per se test. We approve and adopt the McMahon rationale and holding. In the context of this case, to be entitled to punitive damages, plaintiff must establish, by clear and convincing evidence, that defendant was intoxicated, that his intoxication was a cause of the accident, and that one or more separate aggravating circumstances were present to establish that defendant's conduct was accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by his conduct, N.J.S.A. 2A:15-5.12a.
Applying these principles, we are satisfied plaintiff has made a sufficient showing to reach the jury on his punitive damages claim. We reach this conclusion by viewing all of the evidence, together with all reasonable inferences, most favorably to plaintiff.
With a hit-and-run driver who is not apprehended soon after the accident, proof of intoxication at the time of the accident is made more difficult. No breath or blood test is available, nor are the customary psycho-physical tests and observations. Although more difficult, proof of intoxication is nevertheless possible.
Some of the facts and circumstances, considered in combination, from which the jury could infer that defendant was intoxicated at the time of the accident include: (1) defendant's history of unsuccessfully treated alcoholism; (2) defendant's admission that he was drinking on the day of the accident and does not remember how much alcohol he consumed; (3) defendant's admission that he had a habit of self-medicating to excess with alcohol during periods of unemployment, State v. Radziwil, 235 N.J.Super. 557, 563 A.2d 856 (App.Div.1989), aff'd o.b., 121 N.J. 527, 582 A.2d 1003 (1990), and that he was in such a period on the date of the accident; (4) defendant's apparently intoxicated state the next day at about 1:00 p.m., viewed in the context of his admitted alcoholism condition and self-medicating practice when unemployed; (5) defendant's admission to the police the next day that on the date of the accident he "drank from 11:00 a.m. till when he blacked out"; (6) defendant's erratic driving; (7) defendant's exhibition of signs commonly associated with intoxication when stopped in traffic immediately after the accident; and (8) defendant's unexplained inability to remember the accident or even driving on Woodbridge Avenue that day.
*260 Driving under the influence of intoxicating liquor, as proscribed by N.J.S.A. 39:4-50, means the general condition, which may actually be short of what is commonly referred to as "intoxication," which renders the driver "so affected in judgment or control as to make it improper for him to drive on the highways." State v. Johnson, 42 N.J. 146, 165, 199 A.2d 809 (1964). It is a condition in which the defendant "has imbibed to the extent that his physical coordination or mental faculties are deleteriously affected." Ibid. (quoting State v. Emery, 27 N.J. 348, 355, 142 A.2d 874 (1958)).
The proffered evidence, if believed, could lead a jury to reasonably find, by clear and convincing evidence, that defendant was intoxicated (under the influence of intoxicating liquor) at the time of the accident, and that defendant's intoxication was a cause of the accident.
Aggravating circumstances must be evaluated on a case-by-case basis. McMahon, supra, 218 N.J.Super. at 580, 528 A.2d 104. Such circumstances must demonstrate a wanton and willful disregard of persons who foreseeably might be harmed by defendant's conduct. N.J.S.A. 2A:15-5.12a. The defendant's conduct must be deliberate, with knowledge of a high degree of probability of harm and reckless indifference to the consequences of his conduct. N.J.S.A. 2A:15-5.10.
The non-exclusive list of circumstances prescribed by the PDA for a determination of entitlement to punitive damages is instructive. These include the likelihood, at the relevant time, that serious harm would result from the defendant's conduct, N.J.S.A. 2A:15-5.12b(1), the defendant's awareness of reckless disregard of the likelihood that serious harm would arise from his conduct, N.J.S.A. 2A:15-5.12b(2), and any concealment by the defendant of his conduct, N.J.S.A. 2A:15-5.12b(4).
Defendant was aware of his alcoholism. He was twice institutionalized for it and discussed the condition with his personal physician. He was aware that during periods of unemployment he drank excessively to self-medicate. He was aware that he frequently drank to such excess that he would black out. He drank an unknown quantity of alcohol on the day of the accident. Driving under such circumstances is an aggravating circumstance. A defendant cannot shield himself behind a lack of memory induced by severe intoxication. To allow a defendant to escape liability for punitive damages on that basis would turn on its head the concept and purpose of punitive damagesto punish and deter for egregious wrongdoing. Driving after drinking oneself into a stupor, to the point of blacking out and not remembering some or all of what happened, should serve to enhance punitive damages culpability, not to mitigate or eliminate it.
Driving conduct immediately preceding the accident can constitute an aggravating factor. Driving while intoxicated at an excessive speed, in an erratic manner, on a busy street, during rush hour traffic, carries with it the likelihood, at that time and place, that serious harm would result. See McMahon, supra, 218 N.J.Super. at 580 n. 2, 528 A.2d 104 (citing Focht v. Rabada, 217 Pa.Super. 35, 268 A.2d 157 (1970)).
Leaving the scene is clearly an act of concealment of defendant's conduct. It also demonstrates indifference to the consequences of defendant's conduct, by leaving the injured party lying on the road, rather than stopping to lend assistance. See Langlois v. Wolford, 246 Ga.App. 209, 539 S.E.2d 565, 568 (2000).
Plaintiff suggests that mixing prescription medication for depression with alcohol should be an aggravating circumstance. *261 This may require further factual development of what advice or warnings were furnished to defendant prior to the accident by his physician or on labels or written instructions accompanying the medication, and the effects of mixing these substances. Potentially, this could be an aggravating circumstance. See Olson v. Walker, 162 Ariz. 174, 781 P.2d 1015, 1020 (Ct.App.1989).
The aggravating factors for which we find a sufficient evidential basis in the record before us warrant submission of plaintiff's punitive damages claim to the jury. Our discussion does not preclude any others that may be developed. The need to deter driving while intoxicated is great. Too many innocent victims are killed or maimed on our highways with regularity by drunk drivers. We have described the drunk driver as "one of the chief instrumentalities of human catastrophe." State v. Grant, 196 N.J.Super. 470, 476, 483 A.2d 411 (App.Div.1984). Our Supreme Court has observed that "[t]he primary purpose behind New Jersey's drunk-driving statutes is to curb the senseless havoc and destruction caused by intoxicated drivers." State v. Tischio, 107 N.J. 504, 512, 527 A.2d 388 (1987). Imposition of punitive damages in appropriate cases will advance the public policy of deterring and reducing this persistent source of tragedy. The jury might reasonably find that this defendant is the kind of ticking time bomb deserving of punishment and in need of deterrence.[6]
We therefore reverse the trial judge's dismissal of the punitive damages count and remand for trial for punitive damages.[7] This is conditioned, of course, upon plaintiff's successful recovery on retrial of compensatory damages, N.J.S.A. 2A:15-5.13c, see infra.

II
We next address the discovery violation. Plaintiff suffered multiple injuries.
*262 The initial impact occurred between defendant's front bumper and plaintiff's left knee. His most significant injury was to his left knee, which included multiple fractures, damaged cartilage, damaged ligaments (including the anterior cruciate ligament), and internal derangement. Plaintiff was required to use crutches for several months and then used a cane for the balance of the first year after the accident. He was a high school senior when the accident happened on January 12, 1998. He missed the second semester of his senior year and had to complete high school the following Fall.
Plaintiff's interrogatory answers and the medical reports he furnished in discovery are replete with references asserting that plaintiff suffered serious and permanent injuries to his left knee, resulting in "limited use of his left leg," "loss of the use of his left leg," loss of ability to "walk[] properly," and "an antalgic gait,[8] apparently favoring the left side." The word "limp" was not used in describing the condition.
On the first day of trial, May 23, 2001, plaintiff's attorney described in his opening statement plaintiff's injuries and present complaints and restrictions, including a limp. After defense counsel opened, plaintiff's first witness testified for the balance of the morning session. When the parties returned after the lunch recess, defense counsel informed plaintiff for the first time that he was in possession of a videotape, taken over the course of several days in August 2000, which showed plaintiff walking at various outdoor locations, with no discernible limp. The videotape was prepared at the request of the defense and was in defense counsel's possession since September 2000.
Defense counsel informed the court he had not planned on using the videotape because he was not aware until plaintiff's opening that a limp was alleged. Defense counsel claimed surprise about the allegation of a limp and moved for a mistrial. The judge denied the motion and ordered that because the videotape had not been furnished through discovery the defense would not be permitted to use it at trial.
Plaintiff presented his entire case-in-chief on May 23 and May 24. His treating orthopedist and his treating chiropractor both described plaintiff's antalgic gait. When plaintiff was asked whether he presently limps, he responded "Yeah, but I mean, it's not like, you know, my legs are dragging behind. I mean, it's just something I had to learn to deal with. It's almostit's almost normal now. It's been so long, you know, it just feels normal, you know, to be walking that way." He stated that his knees hurt almost every day, especially his left knee. He stated if he stands for thirty minutes to an hour he starts to experience pain in his legs. With respect to his left leg, he stated "I can't stand up too long or walk around too long or else I'll just start feeling pain in it." We gather from the colloquy at trial that plaintiff was limping noticeably during trial.
Plaintiff rested his case at the end of the May 24, 2001 session. He had not seen the videotape. Defense counsel then renewed his request that he be allowed to present the videotape during his case. The judge allowed the parties to brief the issue and argue it at the next session.
*263 Defendant initially argued the videotape had not been requested in discovery. However, plaintiff had propounded Form C Uniform Interrogatories, which included: "9. If any ... videotapes ... were made with respect to anything that is relevant to the subject matter of the complaint, describe [and furnish them or make them available for inspection and copying.]" Defendant's next argument was that the videotape was not "relevant" until plaintiff's opening, when a limp was alleged. The trial judge rejected this argument, and so do we. Defendant's reliance on Kiss v. Jacob, 268 N.J.Super. 235, 633 A.2d 544 (App.Div.1993), rev'd. on other grounds, 138 N.J. 278, 650 A.2d 336 (1994) is unavailing; there the interrogatory requested only photographs, thereby not obligating the other party to disclose a videotape's existence. Id. at 238-42, 633 A.2d 544.
Having determined there was a discovery violation, the judge inquired of plaintiff how he was prejudiced. Plaintiff's counsel noted that he had already rested, and "if the tape is going to be admissible, I have to call the plaintiff again and we're on the defensive. It looks like we were trying to cover up something that we're not trying to cover up.... [I]t puts me on the defensive."
When asked what he would have done differently, counsel stated, "Maybe I would ask questions along the line of is your pain consistent throughout the entire day, are there peaks and valleys. Is your limp consistent 100 percent of the time or on your way home from work is it more pronounced than on your way to work." He concluded, "And beyond those questions, I think that at this point to do the damage control, it does more damage in and of itself regardless of what the tape showed."
The judge rejected the argument and allowed the tape to be played. Plaintiff later testified in rebuttal in an effort to reconcile what was on the tape with his previous testimony. We agree with plaintiff. He reasonably relied on the judge's initial ruling that the tape would not be permitted. Without viewing the tape, he put in his entire case. Had he known in advance, he likely would have adjusted his presentation. The judge's reversal of his earlier order placed plaintiff at a distinct disadvantage, giving the jury the impression that plaintiff was now scrambling and engaging in damage control. This was unfair to plaintiff and had the clear capacity to cause an unjust result. R. 2:10-2; State v. Macon, 57 N.J. 325, 339, 273 A.2d 1 (1971). The error was not harmless. Ibid.
The trial judge, with a feel of the case, acknowledged, in denying plaintiff's new trial motion, that if it was error to allow the tape, the error was not harmless:
I will agree, so you don't have to make this argument, that if I'm not correct and that it was improper to allow the video, that that tape certainly had an [e]ffect on the jurors and it is error, it's error that would be reversible error, because there'sin my own opinion, because that tape, I believe, did have an impact on the jury because it did bel[ie] the plaintiff's testimony and the way he appeared in court, that it, the way he walked in court and walked from the counsel table to the jury box. He limped noticeably then and didn't limp on the tape.
We reverse the compensatory damages judgment and remand for a new trial.
Reversed and remanded.
NOTES
[1] The gross award was $100,000, which the jury reduced by 30% because plaintiff contributed to his injuries by unreasonably failing to follow his doctor's advice. After adding pre-judgment interest of $10,437.64, R. 4:42-11(b), judgment was entered for plaintiff against defendant in the amount of $80,437.64.
[2] At an earlier stage of the litigation, a different judge denied defendant's motion for partial summary judgment, seeking dismissal of the punitive damages count, and we denied defendant's motion for leave to appeal. Defendant again raised the issue at the time of trial, and the trial judge, over objection, entertained the issue, conducted an N.J.R.E. 104(a) hearing, and reached a contrary result. Because of our disposition on the merits of this issue, we do not address plaintiff's argument under the law of the case doctrine.
[3] Ellmyer and Heikal testified that the posted limit was thirty-five miles per hour. We note that the police report states it was twenty-five miles per hour. The officer who investigated the accident at the scene and authored the report did not testify at the N.J.R.E. 104(a) hearing. The parties stipulated that he would testify according to his report, as to what defendant told him when interviewed the next day.
[4] Heikal opined that defendant was "either drunk or you know, high." We do not pass upon whether there is sufficient foundational support for the admissibility of that lay opinion. N.J.R.E. 701. Whether his opinion is admitted or not, however, does not impair the admissibility of Heikal's factual observations of defendant.
[5] Whether the cap exception requires an actual "conviction" is not before us. We note that in this hit-and-run case, the local law enforcement authorities chose not to prosecute defendant for DWI. Law enforcement authorities may choose to forego such prosecutions for any number of reasons in any case. Some references in the PDA's legislative history refer more generally to "drunk driving" as an exception to the cap. Whether proof of intoxication by clear and convincing evidence in the punitive damages portion of a civil trial, where there has been no DWI prosecution or conviction, satisfies the cap exception must await determination in an appropriate case.
[6] We note that defendant incurred a DWI charge on February 2, 1998, three weeks after this accident. He was convicted of that charge. No issue has been raised regarding potential admissibility of this conviction. The issue of potential admissibility has not been briefed or argued and is not before us. We do not pass upon it.
[7] Subsequent to the accident, defendant filed a Chapter 7 bankruptcy proceeding, and he was discharged by order of October 27, 1998. A consent order vacating the automatic stay was entered nunc pro tunc on March 9, 1999, authorizing plaintiff "to institute and prosecute to conclusion one or more actions in the court(s) of appropriate jurisdiction arising from a January 12, 1998 accident wherein Kayhan Dong sustained personal injuries." The order further provided that "[t]he recovery from said action(s) be and hereby is limited to the limits of debtors' insurance policy(ies)." A provision of the Bankruptcy Code provides, however, that a debtor is not discharged of any debt for "personal injury caused by the debtor's operation of a motor vehicle if such operation was unlawful because the debtor was intoxicated from using alcohol, a drug or another substance." 11 U.S.C.A. § 523(a)(9). At the conclusion of the N.J.R.E. 104(a) hearing, the trial judge found that he was not convinced by a preponderance of the evidence that defendant was intoxicated at the time of the accident. He determined, therefore, that the exclusion from dischargeability did not apply, and accordingly plaintiff could not pursue a claim for punitive damages, which are not covered by insurance, or collect any amount, based on lack of good faith, from defendant's insurer in excess of his liability insurance coverage. We are of the view that the issue of whether plaintiff's injuries resulted from defendant's intoxication should be determined by the jury. This will be resolved in the punitive damages trial. The ultimate recoverability of any compensatory or punitive damage award will be adjudicated after trial in an appropriate forum. If defendant wishes to seek relief from this determination in the Bankruptcy Court, either before or after trial, he may pursue such relief.
[8] "Antalgic" means "tending to alleviate pain." Funk & Wagnalls New Comprehensive International Dictionary of the English Language (Encyclopedia Edition 1978). In his trial testimony, plaintiff's treating chiropractor explained that an antalgic gait is characterized by "leaning away from the area of discomfort." He stated that plaintiff "was putting more pressure on his right leg and not putting as much on his left leg and when he ambulated, he ambulated, I guess, in laymen's terms, [with] sort of a limp."