868 A.2d 322 (2005)
375 N.J. Super. 397
Larisa PAVLOVA, individually and in the capacity of General Administratrix and Administratrix Ad Prosequendum of the Estate of Yevgenia Pavlova, deceased, Plaintiff-Respondent,
v.
MINT MANAGEMENT CORP., Menlo Manor Associates, Ltd. (d/b/a Inman Grove Senior Citizen Residence), FCH Services, Inc. (Formerly F.C.H. Company, Inc.), Federal Pacific Electric Co., Anthony Mazzucca, Mazzucca Construction Co., Robert Bauer, Bauer Electric, Electrical Installations, Inc., and Lehigh Edison Co., a joint venture, Defendants-Appellants, and
Mint Management Corp. and Menlo Manor Associates, Ltd. (d/b/a Inman Grove Senior Citizen Residence, Third-Party Plaintiffs),
v.
Federal Pacific Electric Co., Anthony Mazzucca, Mazzucca Construction Co., Robert Bauer, Bauer Electric, And Electrical Installations, Inc., Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 2005.
Decided March 7, 2005.
*323 William H. Mergner, Jr., Cedar Knolls, argued the cause for appellants (Leary, Bride, Tinker & Moran, attorneys; Mr. Mergner, and Lisa G. Kim, on the brief).
Christian P. Fleming argued the cause for respondent (Jabin & Fleming, attorneys; Arnold E. Jabin, East Brunswick, of counsel; Mr. Fleming, on the brief).
Before Judges SKILLMAN, PARRILLO and GRALL.
The opinion of the court was delivered by
PARRILLO, J.A.D.
We granted leave to appeal from the denial of defendants' partial summary judgment motion to dismiss the punitive damages claim brought by plaintiff, Larisa Pavlova, individually and on behalf of the estate of her mother, who was fatally injured in a fire in defendant's housing complex. We now reverse.
Inman Grove Senior Citizens Residence, located in Edison Township, is a housing *324 complex for people sixty-two years old or older. In November, 1999, plaintiff's mother, Eugenia Pavlova, who was seventy-seven years old at the time, moved into an apartment at Inman Grove. On December 18, 1999, at approximately 7:30 a.m., as Ms. Pavlova was preparing to take a bath or shower, a towel on the towel rack was ignited by a wall-mounted electric radiant heater located under and slightly to the right of the towel rack. The fire spread, and, based on her injuries, Ms. Pavlova likely attempted to put out the fire. The building fire alarm was eventually activated when smoke filled the hall.
A maintenance worker, who was in charge of safety at the time of the fire, was awakened by the fire alarm and proceeded to the second floor wing of the building where Ms. Pavlova's apartment was located. He opened the door to her apartment, where he saw flames. Realizing that he could not help Ms. Pavlova, he went to a nearby apartment and asked for help evacuating the other residents. After leading two deaf residents outside, he returned to the main office, at a different location from the building with the fire, where he called 911. When the hallway smoke alarms were activated, the central monitoring station was notified, which should have contacted the fire department. The fire department received a notification at 7:57 a.m.
When the firefighters arrived, they found the fire on the second floor. They entered Ms. Pavlova's apartment and heard her screaming. Meanwhile, firefighters outside had also connected a ladder to the window of the apartment. Finding Ms. Pavlova naked by the window, the firefighters removed her from the apartment through the window. She was burned on her hands and upper body. She was taken to the hospital and later flown to a burn center. Ms. Pavlova died from her injuries twenty-one days later.
The Inman Grove residential complex, owned and operated by defendants, Mint Management Corp. and Menlo Manor Associates, Ltd. (Mint Management or defendant), consists of several buildings containing approximately 240 housing units. All of the apartments are outfitted with electric wall heaters in the bathroom, hard wired to the building's electrical system. The heaters have exposed heating elements protected by a steel grate, and specific directions on the assembly state: "Heater should not be blocked in any manner." Nearby towel racks are placed to the left, and in some cases, directly over the bathroom unit heaters.
Between 1980 and the December 18, 1999 fire, there were two minor fires involving the electric wall heaters at Inman Grove, both resulting from the placement of combustible material directly on or in front of the heaters. On May 19, 1995, a fire started in the bathroom of a unit when the heater ignited undergarments placed directly on it. There were no injuries. Another fire started on December 2, 1995, when clothing in a shopping cart placed near the heater ignited from the heater. Two residents and one firefighter were injured.
After the second fire, the chief fire inspector in Edison sent a letter to defendant, on December 5, 1995, indicating that the "ideal solution" to preventing other fires would be to move the towel rack in the bathroom farther from the heater, but if this were not possible, the residents "must be made aware of the safety requirements when it comes to storing material too close to the heater in the bathroom." As a result, defendant posted a notice on the common bulletin board in the lobby of the housing complex for two to three months warning residents not to put *325 anything in front of the heaters or otherwise obstruct the heaters. Defendant also organized a meeting for the residents with the chief fire inspector. Ms. Pavlova moved into her apartment at Inman Grove well after the posting of the notice and the informational meeting.
Despite the fire chief's recommendation, defendant was never ordered to move the towel racks or cited for their proximity to the electric heaters. In fact, in the twenty years of defendant's operation prior to the December 18, 1999 fire, the Edison Fire Department conducted annual inspections of the Inman Grove complex and never cited the facility for any fire code violations.
Each unit at Inman Grove contains a smoke detector to notify the occupant of smoke in the apartment. These "in room" detectors, however, do not sound the building fire alarm nor summon the fire department or building staff when activated. When smoke enters the hallway and activates a corridor alarm, a central monitoring station is notified, which then contacts the fire department. Automatic fire sprinklers are located in the hallways and common areas of the buildings. On the day in question, December 18, 1999, Inman Grove's fire protection system operated as designed, with the smoke detectors detecting a fire and two automatic sprinkler heads discharging.
As a result of that incident, plaintiff filed a complaint, individually and as the administratrix of her mother's estate, against defendant and others who "designed, manufactured, distributed, sold, installed and repaired" the heater that caused the fire. Her complaint alleged various causes of action, including strict liability, wrongful death, N.J.S.A. 2A:31-1 to -6, and survival, N.J.S.A. 2A:15-3. Plaintiff sought compensatory and punitive damages.
Following discovery, defendant moved for partial summary judgment on plaintiff's claim for punitive damages. In denying the motion, the trial court concluded:
[T]he defendant took no meaningful effort to warn the plaintiff of the likelihood of fire in the event combustible materials were left near the subject heater. While it is true that the defendant placed flyers in the lobby of the building, warning residents of its potential danger, that occurred prior to the plaintiff being a tenant in the building. The defendant, Mint Management, may not insulate themselves from a potential punitive damage claim by choosing the least expensive and less effective method of reducing the hazard.
Additionally, the plaintiffs have adduced other evidence from their experts which tend to prove the state of mind of recklessness of this defendant.
This appeal by leave granted follows.
Defendant asserts that summary judgment should not have been denied on the issue of punitive damages because its actions did not meet the necessary requirements. We agree.
In 1995, the legislature enacted the Punitive Damages Act (Act), N.J.S.A. 2A:15-5.9 to -5.17, which became effective October 27, 1995. The Legislature's purpose in enacting the Act was to establish more restrictive standards with regard to the awarding of punitive damages. See N.J.S.A. 2A:15-5.9; Assembly Insurance Committee Statement, Senate, No. 1496-L.1995, c. 142 (stating the restrictions imposed on the awarding of punitive damages). For example, the Act requires an award of compensatory damages as a statutory precedent for an award of punitive damages and disallows nominal damages as a basis for a punitive damages claim. N.J.S.A. 2A:15-5.13(b) and (c); see also *326 Smith v. Whitaker, 160 N.J. 221, 248, 734 A.2d 243 (1999) (Garibaldi, J., concurring).
In most other respects, the Act codified the common law, Dong v. Alape, 361 N.J.Super. 106, 117, 824 A.2d 251 (App.Div.2003), which limited punitive damages to only "exceptional cases ... as a punishment of the defendant and as a deterrent to others from following his example." Di Giovanni v. Pessel, 55 N.J. 188, 190, 260 A.2d 510 (1970). As the Court explained in Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49, 477 A.2d 1224 (1984), to warrant the imposition of punitive damages:
the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and willful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act.
Thus, N.J.S.A. 2A:15-5.12(a) provides:
Punitive damages may be awarded to the plaintiff only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.
"Actual malice" is "an intentional wrongdoing in the sense of an evil-minded act." N.J.S.A. 2A:15-5.10. "Wanton and willful disregard" is defined as "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." Ibid. Moreover, the Act provides a non-exclusive list of factors that the factfinder must consider in determining whether to award punitive damages:
(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct;
(2) The defendant's awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct;
(3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and
(4) The duration of the conduct or any concealment of it by the defendant.
[N.J.S.A. 2A:15-5.12.]
Case law considers these same types of factors. Thus, circumstances of aggravation and outrage, beyond the simple commission of a tort, are required for an award of punitive damages. Dong, supra, 361 N.J.Super. at 116, 824 A.2d 251. In other words, mere negligence, however gross, is not enough. Ibid.; see also Nappe, supra, 97 N.J. at 50, 477 A.2d 1224. A plaintiff must demonstrate a "deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962). To be sure, the standard signifies something less than an intention to hurt. Dong, supra, 361 N.J.Super. at 116, 824 A.2d 251; see also Mc Laughlin v. Rova Farms, Inc., 56 N.J. 288, 306, 266 A.2d 284 (1970). However, the standard can only be established if the defendant knew or had reason to know of circumstances which would bring home to the ordinary reasonable person the highly dangerous character of his or her conduct. Ibid.; see also Parks v. Pep Boys, 282 N.J.Super. 1, 17, 659 A.2d 471 (App.Div.1995).
*327 Punitive damages were found justified in Smith v. Whitaker, supra, where the defendant oil company's egregious conduct gave rise to the very real likelihood of the immediate and substantial serious injury that actually occurred. 160 N.J. at 247, 734 A.2d 243. In that case, a motorist was killed in an intersectional collision with defendant's 36,000 pound straight-body oil truck when the truck's rear brakes failed. Id. at 227, 734 A.2d 243. As this court found, the oil truck was being operated by a completely inexperienced and virtually untrained driver, who knew nothing about how to adjust air brakes or how the complex braking system on this oil truck actually worked. Smith v. Whitaker, 313 N.J.Super. 165, 191, 713 A.2d 20 (App.Div.1998), aff'd, 160 N.J. 221, 734 A.2d 243 (1999). Defendant's management knowingly and deliberately allowed the truck to be operated after it was placed "out of service" some three weeks before the accident and after being advised by the driver of problems with the brakes. Id. at 192-93, 713 A.2d 20. Knowing that the brakes were not operating properly and having been cited for numerous safety violations on the truck the previous month, defendant never made the needed repairs, failed to regularly adjust the brakes as required by federal regulations, and ignored recordkeeping requirements regarding maintenance. Ibid. After the accident, it was determined that the rear brakes were "totally defective" and that the truck's stopping power had been reduced between 92% and 95%. Id. at 195, 713 A.2d 20.
Likewise, in Dong, supra, we reversed a trial court's summary judgment dismissal of a plaintiff's punitive damages claim, finding plaintiff made a prima facie case of especially egregious conduct that could support such an award. 361 N.J.Super. at 111, 824 A.2d 251. There, a pedestrian was hit while crossing a road, when the defendant, driving erratically at fifty miles per hour, swerved around a car that was stopped to allow pedestrians to cross the street. Id. at 112, 824 A.2d 251. We found, as aggravating circumstances supporting a punitive damage claim, N.J.S.A. 2A:15-5.10, that the defendant was extremely intoxicated and had been drinking an unknown quantity of alcohol earlier on the day of the accident, despite knowing he was an alcoholic and frequently drank to such an excess that he would black out, and that he was driving at an excessive rate of speed in a highly erratic manner on a busy street during rush hour just prior to the collision. Id. at 121-22, 824 A.2d 251. This conduct, we found, carried with it the likelihood that serious and immediate harm would result. Id. at 122, 824 A.2d 251. As if not deliberate enough, the defendant also left the scene in an effort to conceal his conduct. Ibid. Accordingly, we concluded that a jury "might reasonably find that this defendant is the kind of ticking time bomb deserving of punishment and in need of deterrence." Id. at 123, 824 A.2d 251.
On the other hand, we found the evidence in Parks, supra, 282 N.J.Super. at 16-18, 659 A.2d 471 and Allendorf v. Kaiserman Enterprises, 266 N.J.Super. 662, 675-76, 630 A.2d 402 (App.Div.1993), insufficient to sustain punitive damages claims. In Parks, a store sold Freon to a fourteen-year-old boy, who used the Freon with friends as a drug. Parks, supra, 282 N.J.Super. at 5-6, 659 A.2d 471. This sale violated a company policy, instituted because of the dangers of inhaling Freon, prohibiting the sale of Freon to persons under sixteen. Id. at 6, 659 A.2d 471. A seventeen-year-old boy died as a result. Id. at 5, 659 A.2d 471. However, there was no proof that the store knew the purchaser was underage or would use the Freon for an illicit purpose. Id. at 18, 659 A.2d 471. Considering this and the circumstances of *328 the sale, we concluded that there was no malicious or willful conduct permitting punitive damages, even if signs regarding the company policy were not posted in the store. Ibid.
Allendorf involved a plaintiff injured when an elevator door malfunctioned. Allendorf, supra, 266 N.J.Super. at 666, 630 A.2d 402. Although another person was previously injured in the elevator, and an inspection report indicated that the electric eye, designed to immediately reopen the door if something was blocking the door's path during closing, was not operating, the facts did not support a finding that the owner and operator of the elevator was aware of a high probability of injury. Id. at 666, 675, 630 A.2d 402. To the contrary, the elevator appeared to be functioning adequately. Id. at 675, 630 A.2d 402. Moreover, the operator did not simply ignore the problem but contacted a company to have the elevator serviced. Ibid. We noted, in addition, that since the jury ultimately found the operator was not negligent, then a fortiori the evidence would have been insufficient to find the defendant's conduct was malicious or wantonly reckless. Id. at 675-76, 630 A.2d 402.
In the present case, plaintiff does not allege in her complaint actual malice. She alleges instead that defendant, at most, "recklessly, and in disregard of the life and safety of plaintiff's decedent ... maintained ... premises containing a dangerous and defective condition." She argues on appeal that there is enough evidence to enable a jury to rationally find, by clear and convincing evidence, sufficient aggravating circumstances to support a punitive damages award. We disagree.
In contrast to Smith, supra, and Dong, supra, absent here is the blatantly egregious, deliberate conduct that was practically certain to cause both imminent and serious harm. Indeed, no malicious or willful conduct is even alleged. Nor does the evidence admit of the likelihood of serious and imminent harm, much less of defendant's awareness of that likelihood. As in Allendorf, supra, while there were prior incidents at Inman Grove, neither of the two minor fires in 1995 originated in the same manner as the present occurrence. That is, neither was caused by the towel rack's close proximity to the heater. Furthermore, defendant had never been cited for any fire code violation throughout its twenty-year history of operations and annual inspections, and in fact, had been advised by the fire department at the outset that its fire protection system "as designed and installed will meet the requirements of the code as in effect of [sic] the time of construction." Just as significant, defendant was never directed to relocate the towel bars in its apartment bathrooms. Instead, the fire official's recommendation was offered as the preferred of two options. Even then, defendant did not ignore the suggestions, but rather complied by choosing the alternative course of action recommended. Thus, defendant warned residents by posting a notice on a common bulletin board and organized an informational meeting of the residents with fire department officials.
The fact that defendant could have better monitored implementation of this policy by ensuring continual notification to new residents such as decedent may arguably amount to negligence, or even gross negligence, but, in our view, it does not rise to the level of wanton and willful disregard of the likelihood, or high probability, of resultant serious harm. As we said in Parks, supra, a case that also dealt with a notice that was not posted, "[e]ven if signs were not posted according to the store policy or not everyone was aware of the policy, defendants' actions could not, on the proof presented in opposition to the *329 summary judgment motion, be considered as a reckless indifference to any consequences of their actions." 282 N.J.Super. at 18, 659 A.2d 471.
The same is true here. The aggravating circumstances that evidence an utter disregard for others, which were so critical to the decisions in Smith and Dong, and are meant to be punished and deterred by punitive damages, Mancini v. Township of Teaneck, 349 N.J.Super. 527, 568, 794 A.2d 185 (App.Div.2002), aff'd as modified on other issues, 179 N.J. 425, 846 A.2d 596 (2004), are absent in this case.[1] We are satisfied that on the facts of record, including those concerning defendant's fire response, fire protection system, and failure to warn decedent, plaintiff has not provided a prima facie case for the award of punitive damages.[2]Di Giovanni v. Pessel, supra, 55 N.J. at 190-92, 260 A.2d 510. Partial summary judgment should be entered dismissing the claim for punitive damages.
Reversed and remanded.
NOTES
[1] We consider the state of the record as it existed at the time of plaintiff's motion for partial summary judgment, and prior to the trial court's grant of defendant's in limine motion to bar plaintiff's fire expert from testifying about defendant's fire protection system and human response, a determination made after defendant's notice of motion for leave to appeal was filed in this matter.
[2] Punitive damages, in any event, are not permitted on a wrongful death claim, the primary purpose of which "is to compensate survivors for the pecuniary losses they suffer because of the tortious conduct of others...." Smith, supra, 160 N.J. at 231-32, 734 A.2d 243 (quoting Alexander v. Whitman, 114 F.3d 1392, 1398 (3d Cir.) (citation omitted), cert. denied, 522 U.S. 949, 118 S.Ct. 367, 139 L.Ed.2d 286 (1997)); see also N.J.S.A. 2A:31-5; N.J.S.A. 2A:15-5.15.