817 A.2d 409 (2003)
358 N.J. Super. 224
Nancy VELEZ, Plaintiff-Appellant,
v.
CITY OF JERSEY CITY and Arnold Bettinger, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued January 27, 2003.
Decided March 11, 2003.
*410 Cynthia Gill, Teaneck, argued the cause for appellant (Davis, Saperstein & Salomon, attorneys; Ty Hyderally, of counsel and on the brief).
Joseph P. Paranac, Jr., Newark, argued the cause for respondent City of Jersey City (St. John & Wayne, attorneys; Wayne E. Pinkstone, on the brief).
John L. Shahdanian, II, Franklin Lanes, argued the cause for respondent, Arnold Bettinger (Chasan, Leyner, Bariso & Lamparello, attorneys; Mr. Shahdanian, on the brief).
Before Judges PETRELLA, LINTNER and PARKER.
The opinion of the court was delivered by LINTNER, J.A.D.
Plaintiff, Nancy Velez, a former employee of the City of Jersey City (the City), alleges that defendant Arnold Bettinger, a Jersey City councilman, sexually assaulted her on December 1, 1997. On November 10, 1999, she filed a complaint asserting various common law tort claims, as well as a claim for sexual harassment under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, against both Bettinger and the City. Bettinger answered, denying all the allegations and asserting counterclaims against plaintiff for malicious prosecution and defamation. Bettinger's malicious prosecution claim stemmed from a criminal complaint filed by plaintiff in June 1999 that was presented to a Hudson County Grand Jury, which declined to issue an indictment.
Both the City[1] and Bettinger moved for summary judgment in response to which plaintiff filed a cross motion for summary judgment to dismiss Bettinger's counterclaims. The motion judge dismissed plaintiff's common law claims for failure to comply with the notice provisions of the Tort Claims Act, N.J.S.A. 59:8-8. She also dismissed plaintiff's LAD claim against the City on the grounds that it had no notice of any prior sexually discriminatory conduct by Bettinger, and there was no evidence that the City substantially assisted or encouraged Bettinger's alleged misconduct. The judge denied plaintiff's motion to dismiss Bettinger's counterclaims.
*411 Plaintiff and Bettinger, however, entered into a subsequent consent order whereby Bettinger voluntarily dismissed his counterclaims subject to reinstatement "[i]n the event plaintiff is successful on any part of her appeal of the summary judgment motion...." [2] We reverse the summary judgment order dismissing plaintiff's LAD claims against the City and her common law claim of assault and battery against Bettinger and remand those claims to the Law Division for further proceedings. We, however, affirm the dismissal on summary judgment of plaintiff's common law claims against the City and the remaining common law claims against Bettinger.
The following facts were developed in discovery. At the time of the alleged sexual assault, plaintiff was employed by the City in the Neighborhood Improvement Division (NID) and Bettinger, an elected Jersey City councilman, was employed by Hudson County as a division chief in charge of central services. Plaintiff and Bettinger first met in the summer of 1997 when she was assigned by her supervisor to take him on a tour of her territory, which was part of Bettinger's ward. She next saw Bettinger in September 1997 while she was patrolling her territory, at which time she gave him her radio so that he could "call in" a pothole.
In October 1997, plaintiff contacted Bettinger and asked for his assistance in obtaining child support from her former husband. He agreed to help her. After receiving a child support check, plaintiff went to Bettinger's office on December 1, 1997, to thank him for his assistance. Plaintiff alleges that after she thanked him and attempted to shake his hand, Bettinger responded, "[t]his doesn't deserve a handshake, this deserves a hug," and proceeded to hug and kiss her, fondle her breasts and buttocks, and attempt to place his hand between her thighs. She also claims that he "kissed and licked" her face and discussed his political ambitions to "displace" then-Mayor Schundler. Plaintiff claims she struggled and freed herself, after which Bettinger stated, "[a]ll right, goodbye, then, leave my office."
According to plaintiff, she reported the incident to numerous management employees, union officials and coworkers, but the City did not investigate or otherwise respond to her allegations. She asserts that, on December 1, 1997, she reported the assault to Laura Peterson, Code Enforcement Officer; Eufredo Merchan, Field Supervisor; and Frank Hoffman, Field Manager. The following day she reported the assault to John Mateo, North District Supervisor (her direct supervisor and union representative); Charlie Callari, Assistant Director of NID (Mateo's direct supervisor); and Robert Wilson, union president.
Although the specific dates are unclear, plaintiff further claims that she reported the assault to Maureen Corrado, Director of NID (Callari's supervisor); Ms. Lombard, the Business Administrator; Elinor Gibney, Management Specialist; Paul Mackey from the Legal Department; and Bertha Robinson, a co-employee. In March 1999, plaintiff had a conversation with Councilman Vasquez about the assault, at which time she sought a transfer out of NID.
Mateo, Callari, Wilson, and Peterson admitted that plaintiff informed them of her allegations against Bettinger. Callari and Peterson confirmed that they spoke with plaintiff in December 1997. Mateo and Wilson could not recall the dates of their *412 conversations with plaintiff, although the conversations took place sometime after plaintiff spoke to Callari.
None of plaintiff's superiors investigated her allegations or took any remedial measures. Mateo, who had never received sexual harassment training and had never seen the City's policy on sexual harassment, told plaintiff to report the incident to Wilson or Corrado, or take legal action. Wilson, on the other hand, told plaintiff to file a criminal complaint or a union grievance, to which plaintiff responded that she did not think anyone would believe her and she did not want the union to get involved. Other than having a brief conversation with Callari, Wilson did not pursue the matter further.
Wilson and Callari claimed that plaintiff told them she wanted the matter to remain private and asked that they not take any official action in response to her complaint. Nevertheless, according to Callari, he informed plaintiff of his obligation to report her complaint to the City's Business Administrator and gave plaintiff a copy of the City's sexual harassment policy. Callari claimed he also advised plaintiff that, pursuant to the policy, she could file an "official complaint" with the Business Administrator, but plaintiff responded that she did not wish to do so. Callari never had another conversation with plaintiff about her allegations.
After his meeting with plaintiff, Callari informed his superior, Maureen Corrado, of plaintiff's allegations, and also advised Elinor Gibney, the Business Administrator's liaison for sexual harassment complaints. According to Callari, Gibney advised him that, in order for plaintiff's complaint to be pursued, she would have to file a "formal complaint" with the Business Administrator. The record, however, does not reflect that this information was ever relayed to plaintiff.
As of December 1997, Gibney and Larry Ross were the two individuals designated by the Business Administrator to respond to complaints of sexual harassment. Neither Gibney nor Ross recalled, or had any record of, a sexual harassment complaint made by plaintiff in December 1997, nor did they have a recollection or record of receiving such a complaint from Callari. They claimed that the first time they heard about plaintiff's allegations against Bettinger was in June 1999, after plaintiff had filed the criminal complaint. According to Gibney, the sexual harassment policy applicable in December 1997 required complaints to be made in writing, whether by the employees themselves or a supervisor.
Plaintiff alleges that, prior to December 1, 1997, the City did not have in place "adequate training, education, policies and procedures to safeguard its employees ... from sexual harassment." She also claims that, although she was aware that sexual assault was prohibited, she never received any training on the subject, nor did she recall ever receiving a copy of the City's sexual harassment policy.
Under the sexual harassment policy in effect at the time of the alleged assault, when a sexual harassment complaint is received by the Business Administrator, either directly from an employee, or through a supervisor, Ross and Gibney would investigate the allegations and present the results to the Business Administrator, who would then decide on the appropriate remedial action, which could include disciplinary proceedings against the accused. Both Gibney and Ross stated that a supervisor was obligated to report all incidents of sexual harassment and did not have any discretion in that regard. However, according to Ross, under the policy in effect as of December 1997, if a supervisor informed the Business Administrator *413 of an allegation of sexual harassment but the employee-victim did not wish to pursue the complaint, the office of the Business Administrator would decide whether or not to proceed with an investigation.
Commencing in or about December 1997, the City also conducted sexual harassment training for all its employees and officials. The City's program was mandatory for all employees, including councilmen. However, as of June 2000, Bettinger had not attended the training, due to scheduling conflicts. Callari received sexual harassment training on December 30, 1997
After the December 1, 1997 incident, plaintiff took a leave of absence from work due to an unrelated on-the-job injury. She remained out of work from December 1997 through March 1999. Although not made part of either her initial complaint or amended complaint, plaintiff contended in answers to interrogatories that after she returned to work she was retaliated against for complaining about Bettinger. Specifically, she contended that: (1) she was scheduled for assignments that conflicted with her child's day care; (2) she was not given a functioning radio; (3) her hours were continuously changed; (4) she was not given a proper uniform to wear; (5) Callari treated her in a "cold fashion;" (6) she was refused light duty by Callari and Corrado and falsely informed that there were no light duty assignments for City employees; (7) she was compelled to take a fitness for duty examination upon her return to work, during which she was tested for drugs without her consent; and (8) after she tested positive for drugs, she was informed by Callari that he was going to recommend her termination, compelling her to make an involuntary resignation (constructive discharge) and take a "buy-out" offered by the City.
According to Callari, upon the advice of Ross, he asked plaintiff to undergo a fitness for duty examination, despite a doctor's report that cleared her to return to work, because she was complaining of being physically unable to perform her job. Callari stated that plaintiff consented to his request. He claimed that the doctor who administered the test wanted to conduct a drug test on plaintiff because during the examination plaintiff appeared to be under the influence of drugs. The doctor informed Callari that plaintiff agreed to the test, so Callari approved it. According to Callari, plaintiff admitted to him on a later date that she had consented to the drug test.
Finally, Callari admitted that he informed plaintiff that she would face disciplinary charges as a result of the positive drug test and that he intended to recommend her termination. Callari claimed that his decision to recommend termination was based upon the combination of the positive drug test and plaintiff's other performance problems. Ross, however, could not recall any employee who had been terminated due to the use of illegal drugs, except where there were criminal charges involved.

I.
We focus initially on the LAD claims.[3] Because plaintiff's LAD claims were resolved on a motion for summary judgment, we consider the factual issues in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Plaintiff contends, essentially, that there were sufficient *414 facts to demonstrate that the City violated the LAD by failing to process plaintiff's immediate complaint of sexual harassment and violating its own policy in handling her allegations. She also contends that the record establishes sufficient facts to show that she was the subject of retaliation and an actionable hostile work environment after she returned to work.
The City, relying upon Whitaker v. Mercer County, 65 F.Supp.2d 230 (D.N.J. 1999), aff'd, 251 F.3d 155 (3d Cir.2000), counters that it cannot be held liable for Bettinger's actions because it did not have any prior knowledge of his propensities toward sexual discrimination. It further contends that it cannot be held liable for failing to take any remedial measures in response to plaintiff's complaint because there have been no further incidents of sexual harassment involving Bettinger. The City also points out that because plaintiff's claim for retaliation was not pled and, thus, was not properly before the trial court, it cannot provide a basis to reverse the grant of summary judgment in its favor.
The LAD prohibits hostile work environment sexual harassment in cases where employees are harassed because of their sex to the point where the working environment becomes hostile. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 600-01, 626 A.2d 445 (1993). With respect to hostile work environment sexual harassment, the Supreme Court has held that
a plaintiff states a cause of action for hostile work environment sexual harassment when he or she alleges discriminatory conduct that a reasonable person of the same sex in the plaintiff's position would consider sufficiently severe or pervasive to alter the conditions of employment and to create an intimidating, hostile, or offensive working environment.
...
The test can be broken down into four prongs: the complained-of conduct (1) would not have occurred but for the employee's gender, and it was (2) severe or pervasive enough to make a(3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive.

[Id. at 592, 603-04, 626 A.2d 445.]
The first prong is automatically satisfied where the alleged conduct is sexual or sexist in nature, as with sexual comments or touching. Id. at 605, 626 A.2d 445; Woods-Pirozzi v. Nabisco Foods, 290 N.J.Super. 252, 266, 675 A.2d 684 (App. Div.1996). The remaining prongs can be met through a single incident of harassment if it is sufficiently severe such that a reasonable woman would consider the work environment hostile or abusive. Taylor v. Metzger, 152 N.J. 490, 498-99, 706 A.2d 685 (1998); Lehmann, supra, 132 N.J. at 606-07, 626 A.2d 445.
An employer may be held liable for the sexual harassment of its employees by supervisors, co-employees or even third parties. Section 219(2)(b) of the Restatement (Second) of Agency (1958) subjects a master to liability for the torts of its servants while acting outside the scope of their employment where "the master was negligent or reckless." Accordingly, an employer may be held liable for sexual harassment under a theory of negligence based upon "its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms." Lehmann, supra, 132 N.J. at 621, 626 A.2d 445. The absence of such preventative mechanisms is "strong evidence of an employer's negligence," although it is not negligence per *415 se. Id. at 621-22, 626 A.2d 445; cf. Faragher v. City of Boca Raton, 524 U.S. 775, 805-08, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662, 687-89 (1998).
"If a plaintiff can show that an employer had actual knowledge of the harassment and did not promptly and effectively act to stop it, liability ... may be appropriate" under a theory that the employer intended the harassment, or was negligent or reckless in permitting it to occur. Lehmann, supra, 132 N.J. at 622, 626 A.2d 445.
When the employer knows or should know of the harassment and fails to take effective measures to stop it, the employer has joined with the harasser in making the working environment hostile. The employer, by failing to take action, sends the harassed employee the message that the harassment is acceptable and that the management supports the harasser.
[Id. at 623, 626 A.2d 445; see also Payton v. New Jersey Tpk. Auth., 148 N.J. 524, 536, 691 A.2d 321 (1997).]
Effective remedial measures are those that are "reasonably calculated to end the [alleged] harassment." Lehmann, supra, 132 N.J. at 623, 626 A.2d 445. What is required is an evaluation of the entire remedial process engaged in by the employer, including, for example, the speed, diligence, and good faith with which a sexual harassment investigation is undertaken. Payton, supra, 148 N.J. at 537, 691 A.2d 321.
Recently, in Gaines v. Bellino, 173 N.J. 301, 801 A.2d 322 (2002), the Court held that the existence of a sexual harassment policy alone is insufficient to establish the affirmative defense to vicarious liability in a hostile work environment claim. In remanding the case to the Law Division, the Supreme Court observed that, where there are
genuine factual issues concerning whether this employer had implemented an anti-sexual harassment workplace policy that provided realistic preventative and protective measures for the employees in the event that harassment occurred summary judgment should not be granted.

[Id. at 303, 801 A.2d 322.]
In reaching its decision, the Court in Gaines, refering to Lehmann, stated:
As expressed in Lehmann, an employer's sexual harassment policy must be more than the mere words encapsulated in the policy; rather, the LAD requires an "unequivocal commitment from the top that [the employer's opposition to sexual harassment] is not just words[,] but backed up by consistent practice." The "mere implementation and dissemination of anti-harassment procedures with a complaint procedure does not alone constitute evidence of due care let alone resolve all genuine issues of material fact with regard to due care." In Lehmann, this Court recognized that although the "existence of effective preventative mechanisms provides some evidence of due care on the part of the employer[,] ... given the foreseeability that sexual harassment may occur, the absence of effective preventative mechanisms will present strong evidence of an employer's negligence."

[Id. at 319, 801 A.2d 322 (citations omitted).]
Pointing out the factual issues that prevented the granting of summary judgment, the Court in Gaines noted that a number of employees admitted they had not received sexual harassment training. Further, there were "serious factual issues" regarding the extent to which the employer monitored and enforced its sexual harassment policy, including for example, *416 the employer's response, or lack thereof, to the plaintiff's oral complaints of harassment and the legitimacy of the plaintiff's fear of retribution if she filed a "formal" complaint of harassment under the employer's policy. Id. at 316-19, 801 A.2d 322.
Applying these principles to the facts here convinces us that a question of fact exists concerning the reasonableness of the City's dissemination, implementation, monitoring and enforcement of its sexual harassment policy. Plaintiff's proofs establish that, although the policy was in effect at the time of the incident, she and other city employees and officials, including Bettinger, had not been trained. The proofs also cast significant doubt on whether the policy was enforced. Specifically, after the alleged incident, plaintiff promptly complained to both her direct supervisor and her supervisor's supervisor, Callari. Callari, in turn, reported the complaint to his direct supervisor, as well as the person who had direct responsibility for conducting investigations pursuant to the City's sexual harassment policy. Nevertheless, no investigation was conducted and no effort was made to remediate past conduct or prevent future similar conduct.
Although plaintiff stated that she informed Callari of the incident in his capacity "as a friend," Callari made it clear to her that he was required under the City's policy to report her complaint to the appropriate individuals in the City's management, which he apparently did. Thus, it was reasonable for her to assume that some action might be taken. Torres v. Pisano, 116 F.3d 625, 638-39 (2d Cir.), cert. denied, 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). More importantly, the nature of the alleged harassment was so severe and offensive that one could assume that a reasonable employer would not stand by, even if requested to do so by a terrified employee. Ibid. This is especially relevant here, where the alleged violator of the anti-sexual harassment policy was a Councilman, who by virtue of his position was a policy maker for the employer.
At oral argument on appeal, the City asserted that, under Whitaker, supra, 65 F.Supp.2d at 230, its obligation to investigate is not triggered until it has prior knowledge of an individual's discriminatory conduct. We disagree. In Whitaker, the plaintiff alleged she had been sexually assaulted by her supervisor, a fellow corrections officer. She contended that her employer knew or should have known that the supervisor was likely to commit a sexual assault based upon eight past episodes for which the employer failed to take action. However, the facts revealed that none of the prior episodes amounted to sexual harassment but instead came about because the supervisor suffered from diabetic seizures. Unlike the facts here, it was undisputed that the plaintiff's employer in Whitaker took immediate steps to rectify the supervisor's discriminatory behavior after receiving the plaintiff's complaint. There was no allegation that the defendant was itself negligent in failing to rectify the incident complained of.
By contrast, plaintiff's claim here is directed at the City's negligent failure to investigate and utilize its sexual harassment policy to address future similar incidents by Bettinger, thus creating the hostile environment that proximately caused her damages. The City's argument that it can avoid liability for failing to implement its own policy because there is not evidence that Bettinger has repeated his offense lacks merit. This argument contravenes the very reason for the implementation of a sexual harassment policy and ignores the possibility that there *417 may have been additional victims who have not come forward with a complaint.
We, therefore, conclude that summary judgment should not have been granted on the LAD claims as there were sufficient facts to establish a triable issue concerning negligence on the part of the City for failure to adequately enforce its own policy, thus creating the hostile work environment that plaintiff alleges was a proximate cause of her damages.
Recognizing that motions to amend pleadings are to be liberally granted and addressed to the sound discretion of the trial court, in view of our remand we defer the determination of the procedural appropriateness of plaintiff's LAD-based claims for retaliation to further proceedings in the Law Division. Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 456-57, 713 A.2d 411 (1998).

II.
Plaintiff's complaint alleges various common law claims against the City. These include: (1) negligent hiring, training, and supervision; and (2) negligent and/or intentional infliction of emotional distress. Plaintiff essentially asserted the same claims against Bettinger, adding the claim of assault and battery. On appeal, plaintiff contends that the motion judge erred in dismissing the common law claims against the City because she had not substantially complied with the notice requirements of the Tort Claims Act (the Act). She asserts that her oral notification to Callari should be deemed to be in substantial compliance with the statutory notice of claim requirement. N.J.S.A. 59:8-3, -4 and -5.
It is elementary that, at the very minimum, a notice of claim under the Act must be in writing. Anske v. Borough of Palisades Park, 139 N.J.Super. 342, 348, 354 A.2d 87 (App.Div.1976). Oral notice, even where it contains the elements required by N.J.S.A. 59:8-4, does not constitute substantial compliance. Ibid. We have held a similar argument, that notice given during an oral conversation constituted substantial compliance, to be "without merit." In re Roy, 142 N.J.Super. 594, 601, 362 A.2d 589 (App.Div.), certif. denied, 71 N.J. 504, 366 A.2d 660 (1976). Likewise, plaintiff's arguments here are without merit and do not warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

III.
We come to a different conclusion concerning the assault and battery claim against Bettinger. N.J.S.A. 59:3-14 provides:
a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful conduct.
b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful conduct.
At the time the Act was adopted in 1972, the notice of claim provisions did not apply to public employees. In June 1994, N.J.S.A. 59:8-3, which provided that no action could be brought against a public entity unless the claim was presented in accordance with the notice provisions of the Act, was amended to include public employees. Bettinger asserts that the motion judge correctly afforded him protection under the amended version of this provision. We disagree.
*418 The principles of statutory construction are well settled. "The plain language of a statute is paramount in determining its proper meaning and application unless that language is inconsistent with manifest legislative intent or another meaning expressly indicated." Cox v. Cox, 335 N.J.Super. 465, 476-77, 762 A.2d 1040 (App.Div.2000). The court's goal, however, is to "`effectuate the legislative intent in light of the language used and the objects sought to be achieved.'" Merin v. Maglaki, 126 N.J. 430, 435, 599 A.2d 1256 (1992) (quoting State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980). As such, unless the legislative intent is to the contrary, the plain language of the statute must be given its ordinary meaning. Id. at 434-35, 423 A.2d 294. Legislative intent may be ascertained from extrinsic evidence such as floor debates and committee reports. State v. Hoffman, 149 N.J. 564, 578, 695 A.2d 236 (1997). Only when the "result [a statute] apparently decrees is difficult to fathom or where it seems inconsistent with [the legislature's] intention" may a court look beyond the plain meaning of the statutory language. Public Citizen v. United States Dep't of Justice, 491 U.S. 440, 455, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377, 392 (1989). Although the legislative history and sponsor statements do not bind our interpretation of the statute, they inform our decision by providing important insight into the Legislature's intent and the statute's "overall policy and purpose." Cedar Cove, Inc. v. Stanzione, 122 N.J. 202, 211, 213, 584 A.2d 784 (1991).
Application of these principles leads us to conclude that the amendment to N.J.S.A. 59:8-3, extending application of the notice provisions to public employees, was not intended to modify the plain meaning of N.J.S.A. 59:3-14. While we recognize that normally the most recent addition to a statute "should prevail as the latest declaration of the legislative will," 1A Norman J. Singer, Statutes and Statutory Construction § 22:34 (6th ed.2002), such rules may be overcome where they lead to a result that contradicts the objectives of the legislation. See Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323, 744 A.2d 175 (2000). The 1972 Task Force Comment to the Act makes it clear that the intent behind N.J.S.A. 59:3-14 is to prevent "public employee[s] guilty of outrageous conduct" from availing themselves of the "limitations as to liability and damages contained in [the] act." The assault and battery alleged to have been perpetrated by Bettinger would be outside the scope of his duties as a councilman. If proven, Bettinger's actions would qualify as the type of "outrageous conduct" sought to be excluded from the protections of the Act by N.J.S.A. 59:3 14. To permit Bettinger to avail himself of the notice provisions to avoid liability for such outrageous conduct would, under these circumstances, run counter to legislative intent and the overall purpose of the Act.
We reverse the summary judgment order dismissing plaintiff's LAD claims against the City and her common law claim of assault and battery against Bettinger and remand those matters to the Law Division for further proceedings. In all other respects the judgment of the Law Division is affirmed.
NOTES
[1] The City's answer is not included in the appendix.
[2] The judge also dismissed Bettinger's cross claims against the City, which dismissal is not the subject matter of this appeal.
[3] Plaintiff does not appeal the dismissal of her LAD claims against Bettinger and, therefore, we do not address them.