842 A.2d 280 (2004)
367 N.J. Super. 184
William TAGLIERI, as Executor of the Estate of Mark F. Yatrofsky, Deceased, Plaintiff-Respondent,
v.
Albert MOSS, M.D., Defendant-Appellant, and
Eckerd Drugs and Boyts Pharmacy, Defendants.
Albert Moss, M.D., Third-Party Plaintiff-Appellant,
v.
William Taglieri, Individually, and Barry Sherwin, Third-Party Defendants, and
Claus Warnebold, Third-Party Defendant/Counterclaimant-Respondent.
Claus Warnebold, Fourth-Party Plaintiff,
v.
Prudential Property and Casualty Ins. Co. of New Jersey, Fourth-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 2003.
Decided February 26, 2004.
*281 Franca D. Maiorano-Hobbs, Roseland, argued the cause for appellant Albert Moss, M.D. in A-5052-02T5 (Sharp & Brown, attorneys; Ms. Maiorano-Hobbs, of counsel, Leonard S. Rothbard, on the brief).
Lauren Koffler O'Neill, argued the cause for appellant Albert Moss, M.D. in A-5053-02T5 (Post, Polak, Goodsell, MacNeill & Strauchler, attorneys; Ms. O'Neill, of counsel, Ms. O'Neill, Roseland and Nancy Crosta Landale, Madison, on the brief).
Leonard C. Leicht, Livingston, argued the cause for respondent Claus Warnebold *282 in both appeals (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; Mr. Leicht, of counsel and on the brief).
David Mazie, Livingston, on behalf of respondent William Taglieri, joined in the brief filed on behalf of respondent Claus Warnebold in both appeals (Nagel, Rice & Mazie, attorneys; Mr. Mazie, of counsel).
Before Judges CARCHMAN, WECKER and WEISSBARD.
The opinion of the court was delivered by WECKER, J.A.D.
These appeals, which we now consolidate and address in one opinion,[1] arise in the context of a medical malpractice action brought by fourth-party plaintiff Claus Warnebold against defendant Albert Moss, M.D. Warnebold alleges that Moss's excessive prescription of narcotic drugs proximately caused his drug addiction. The record establishes that Moss knowingly violated regulations that control the prescription of Schedule II narcotic drugs. Three significant issues are raised by these appeals.
The first issue, common to both appeals brought on behalf of Moss, is whether a physician's knowing violation of the regulations is merely evidence of professional negligence, or whether the violation establishes negligence as a matter of law. The second issue, relating only to the appeal in A 5053, is whether the physician's conduct constitutes "willful misconduct" as contemplated by the Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3, specifically N.J.S.A. 59:3-14, as a matter of law. The third issue, also relating solely to A-5053, is whether the verbal threshold established by the Act, N.J.S.A. 59:9-2d, shields the physician from liability for non-economic damages despite the non-exoneration provisions of N.J.S.A. 59:3-14.[2]
Both appeals arise out of Warnebold's medical malpractice action against his former physician, Moss.[3] Warnebold alleges that Moss wrote post-dated and undated *283 prescriptions for several Schedule II narcotic drugs, contrary to N.J.A.C. 8:65-7.5(a)[4] and N.J.A.C. 8:65-7.9,[5] regulations enacted pursuant to the New Jersey Controlled Dangerous Substances Act, N.J.S.A. 24:21-1 to-53.[6] Warnebold claims that Moss's conduct was a proximate cause of his addiction to narcotics and resulting damages.
After a confusing history of orders on several dispositive motions filed by various parties, the Law Division Judge granted partial summary judgment "on liability" in favor of Warnebold, holding that Moss's willful violations of the administrative regulations constituted negligence as a matter of law.[7] The judge also held that Moss's actions constituted willful misconduct pursuant to N.J.S.A. 59:3-14 and deprived defendant of any protection otherwise available under the Tort Claims Act, specifically, the verbal threshold set forth in N.J.S.A. 59:9-2d. We granted Moss's motions for leave to file these interlocutory appeals and now affirm in both appeals.
A brief summary of the facts will be sufficient for purposes of these appeals. Warnebold's medical history, specifically his use of addictive narcotic drugs, apparently began in 1987 with Percocet prescribed for headaches. His drug use continued through 1990, when he underwent a lumbar laminectomy, but he went through a hospital-based detoxification program in 1991. In March 1997, while Moss was employed as a physician for HIP/Pinnacle Medical Group, Warnebold first became his patient. Over the next four years, Moss repeatedly provided Warnebold with post-dated and undated prescriptions for narcotic drugs known as Percocet and Tylox, as well as for a muscle relaxant known as Soma.[8]
Pursuant to an agreement between Moss and Warnebold that neither disputes, Moss wrote prescriptions for those drugs for Warnebold for months at a time. Moss also instructed Warnebold not to present an undated or post-dated prescription to *284 any pharmacy. In April 1999, Moss became an employee of the University of Medicine and Dentistry of New Jersey ("UMDNJ"), a public entity, where he continued to treat and prescribe for Warnebold until some time in the first half of 2001.[9]
Moss testified in depositions that he knew that Schedule II narcotics required a prescription, and that the drugs he prescribed for Warnebold had the potential for being addictive. Moss admitted that Warnebold was "pain medication dependent," meaning that his "complaints may exceed the usual medication schedule." Moss also knew that the law prohibited doctors from writing prescriptions to authorize refills for narcotic drugs. He also testified that he believed that it was acceptable medical practice to write undated or post-dated prescriptions for Schedule II narcotics and that at no time did he deviate from what he presumed to be the standard of care owed to his patient.
When questioned about limits on the permissible quantity of such medications to be prescribed, and confronted with prescriptions he wrote that bore dates three or four days apart, each for quantities of 80 or 120 pills, filled at several different pharmacies, Moss answered that the amount would depend upon the patient's need and one should not prescribe "a ridiculous" amount. The record supports Warnebold's experts' descriptions of an excessive quantity and frequency of prescriptions written for him by Moss, far in excess of the quantity that would be medically supportable.
There is no dispute that Warnebold was already addicted to prescription narcotic drugs when he came to Moss, asking for prescriptions for Percocet and Tylox, a fact Warnebold's expert, Kevin E. Bell, M.D., noted in his report. Nothing in the record contradicts Dr. Bell's statement that the recommended dosage for those drugs is a maximum of two tablets, four times a day for "short term" pain relief.[10]
The record reflects, for example, that in the seven-month period from January 24, 2001 through July 7, 2001, Moss provided Warnebold with prescriptions for 840 Tylox plus 2,920 Percocet, for a total of 3,760 units. Moss alleges that he provided prescriptions for a larger supply to accommodate Warnebold, for whom it was difficult to make frequent trips to the doctor's office. He presented no expert opinion, however, that Warnebold's condition and the amounts of Schedule II drugs he prescribed for Warnebold were within the limited exception provided by N.J.A.C. 13:35-7.6(c) (See Appendix A to this opinion). Moss actually saw Warnebold in the office only about once every three months.
The procedural history of this case is unusual. On October 28, 1999, Taglieri filed a malpractice complaint against Moss and various pharmacies for the negligent death of Mark Yatrofsky. The complaint alleged that Moss negligently prescribed narcotics which caused Yatrofsky to become addicted, and that as a result of his *285 addiction, Yatrofsky was under the influence of a narcotic drug when he fell down a flight of stairs and sustained fatal injuries. Moss raised the defense of comparative negligence and filed a third-party complaint against Warnebold, seeking indemnification and contribution on the basis of Warnebold's alleged negligence in violating a duty to his friend, Yatrofsky.[11]
Warnebold filed an answer along with a fourth-party complaint against Moss, alleging that Moss committed professional negligence by unlawfully providing him with excessive prescriptions for narcotic drugs. Moss's answer to Warnebold's fourth-party claim included defenses under the Tort Claims Act for the period when he was employed by UMDNJ.
Moss moved for partial summary judgment dismissing Warnebold's medical malpractice claim with respect to the period after April 1, 1999 on the grounds of the Tort Claims Act verbal threshold. By cross-motion, Warnebold moved to bar the testimony of Moss's expert witness, Dr. George Mellendick, as a net opinion. The judge initially granted Moss's summary judgment motion, although he later reversed himself. The judge did not decide the cross-motion to bar Moss's expert.
Shortly after Moss's deposition, Warnebold moved for summary judgment against Moss for the period prior to April 1, 1999, when he was in private practice. On November 21, 2002 Warnebold also moved for reconsideration of the summary judgment previously entered in favor of Moss (based on the Tort Claims Act) for the period after April 1, 1999, as well as to bar Moss from offering Dr. Mellendick's testimony at trial. The motion judge initially denied Warnebold's motion for reconsideration, but on March 17, 2003, the judge heard what he described as Warnebold's "continuation... of the motion for reconsideration" of the order granting Moss summary judgment. During that argument, the judge described his reason for granting summary judgment to Warnebold against Moss for the private practice period (before April 1, 1999):
Because II remember I felt very strongly that theand I'm very reluctant to grant summary judgment, but I remember clearly saying that there was a clear violation of the administrative code or something on this and thatand this that clear violation was adequate for summary judgment to be granted.
The judge then granted partial summary judgment to Warnebold and later issued an order vacating the prior order in favor of Moss, holding that as a matter of law the doctor had breached the required standard of care in relation to Warnebold.
The court further held that because Moss's misconduct was willful, the verbal threshold provision of the Tort Claims Act did not bar Warnebold's action. On April 7, 2003, the judge issued an order granting Warnebold partial summary judgment for both periods, that is, for the periods when Moss was a public employee as well as when he was privately employed.
In explanation of the partial summary judgment against Moss "on liability," the judge said:
[T]he willful misconduct here is the fact that he says, I knew what the law was, there is a statute that says you're not allowed toto write refills ... I will go and I will violate the administrative code, which he knew about, which is where the legislature codified the statute *286 in order to keep doctors from doing the conduct which ... Dr. Moss was engaged in.
....
I think he stated in his deposition testimony that he was aware of the administrative code regulation. I think he stated somewhere else that hethat he continued to prescribe this ... drug and if you just put the two sentences together, then you seeyou can draw the conclusion that there was a violation of without him formally admitting it.
....
I thought that the administrative code was the protocol for which at least one of those series of departure from the standard of care was premised.
....
If the protocol was there, and the protocol might've been a hospital protocol as opposed to an AC, administrative code,... but my recollection is [cases] have been premised by the expert throwing a dart at the defendant saying there's a protocol, there's something in the administrative code and that also constitutes a departure.
....
[T]his [N.J.S.A. 59:]3-14 clearlyclearly contemplates an ex the fact that summary judgment should be granted ... [T]he way I read it, willful misconduct means from what I've heard of the testimony,... Dr. Moss was aware of the administrative code provisions and yet he continued to prescribe. So based upon that I will grant summary judgment on the issue of liability only. The issue of proximate cause is gonna be harsh for everybody.[12]
The net result of all of the proceedings on motions was that the judge entered partial summary judgment against Moss and in favor of Warnebold, holding that Moss deviated from the applicable professional standard of care owed to Warnebold and that the Tort Claims Act did not insulate Moss from liability for any damage proximately caused by his deviation.
I. Summary Judgment
The standard applicable to a motion for summary judgment is clearly set forth in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 666 A.2d 146 (1995). The same standard is applicable on review of a trial court's decision. Dong v. Alape, 361 N.J.Super. 106, 111, 824 A.2d 251, 254 (App.Div.2003). [A portion of Part I has been omitted for purposes of publication.]
II. Negligence
Whether the violation of these regulations is admissible as evidence of a deviation from the applicable standard of care, or establishes a deviation as a matter of law, the evidence here is so one-sided that partial summary judgment in favor of Warnebold on the issue of Moss's deviation must be affirmed.
[The balance of Part II has been omitted for purposes of publication.]
III. Willful Misconduct and the Tort Claims Act
Moss's appeal in A-5053, in addition to the same negligence issue addressed in A-5052, challenges the partial summary judgment in favor of Warnebold dismissing Moss's Tort Claims Act defense *287 based upon the determination that Moss's conduct in writing the prescriptions constituted "willful misconduct" as contemplated by N.J.S.A. 59:3-14, leaving him personally liable to Warnebold for damages proximately caused by such conduct.
N.J.S.A. 59:3-14 provides:
a. Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.
b. Nothing in this act shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct.[13]
Moss contends not only that there is a material issue of fact on the issue of willful misconduct, but also that Warnebold cannot invoke that section of the Tort Claims Act to support a claim for non-economic damages because he cannot meet the verbal threshold set forth at N.J.S.A. 59:9-2d.[14] We address those arguments in reverse order, first considering the relationship between these two sections of the Tort Claims Act.
Moss contends that irrespective of whether his actions respecting the prescriptions he wrote for Warnebold are deemed to be "willful misconduct," he is entitled to the protection of the verbal threshold set forth by N.J.S.A. 59:9-2d because Warnebold cannot establish "permanent loss of a bodily function, permanent disfigurement or dismemberment." In other words, Moss contends that the threshold established by the Tort Claims Act as a barrier to non-economic damages serves to bar recovery against a public employee even "if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct."[15] We disagree.
Statutory interpretation requires attention to the Legislature's intent, which is to be sought initially in the plain language of the statute. Frugis v. Bracigliano, 177 N.J. 250, 280, 827 A.2d 1040, 1058 (2003). The plain language of N.J.S.A. 59:3-14 is beyond dispute. "Nothing in this act shall exonerate" such an employee. (Emphasis added). We see no indication in the Act and no evidence that the Legislature intended anything other than what it said. The Legislature's intent with respect to the relationship between N.J.S.A. 59:3-14 and the verbal threshold provision of the *288 Act is evidenced in the 1972 Task Force Comment to N.J.S.A. 59:3-14: "It is the intent of this provision that a public employee guilty of outrageous conduct cannot avail himself of the limitations as to liability and damages contained in this act." (Emphasis added).
Similarly, in Delacruz v. Borough of Hillsdale, 365 N.J.Super. 127, 838 A.2d 498, 2004 WL 32662 (App.Div.2004), we recently held that the verbal threshold provision of the Tort Claims Act, N.J.S.A. 59:9-2d, does not apply where the public employee defendant is subject to the non-exoneration provision of N.J.S.A. 59:3-3.[16] That provision uses language strikingly similar to the language of N.J.S.A. 59:3-14 to articulate the Legislature's intention that the Tort Claims Act not relieve public employees of liability for certain egregious conduct.
We also note that in addressing a conflict between N.J.S.A. 59:3-14 and the notice of claim provisions of the Tort Claims Act, two recent decisions by different panels of this court have taken opposite views of the question whether failure to file a timely notice bars recovery against a public employee for "crime, actual fraud, actual malice or willful misconduct." See N.J.S.A. 59:3-14. Compare Velez v. City of Jersey City, 358 N.J.Super. 224, 239-40, 817 A.2d 409, 417-18 (App.Div.) (public employee accused of assault and battery is not entitled to the protection of the notice of claim provisions of the Tort Claims Act), certif. granted, 177 N.J. 224, 827 A.2d 291 (2003), with Bonitsis v. New Jersey Inst. of Tech., 363 N.J.Super. 505, 833 A.2d 679 (App.Div.2003) (failure to meet the notice of claim requirements of the Act bars recovery against the individual employee charged with an intentional tort as well as the public entity).
Specifically referring to N.J.S.A. 59:3-14 in Velez, we invoked the principle that the plain language of the statute controls unless it is inconsistent with apparent legislative intent. 358 N.J.Super. at 239, 817 A.2d at 418. By contrast, the rationale expressed in Bonitsis was that holding the injured party to the notice requirement, even in a case alleging an intentional tort for which the entity would not be vicariously liable, was consistent with the legislative intent because it
affords the public entity an opportunity to correct the practices which gave rise to the claim, ... to investigate the claim[ ], and take disciplinary or other appropriate action to rectify inappropriate behavior or flawed practices, if necessary, regardless of whether the State is liable for damages.[17]
[363 N.J.Super. at 521, 833 A.2d at 688.]
Irrespective of whether Velez or Bonitsis prevails with respect to the relationship between N.J.S.A. 59:3-14 and the notice of claim provisions, the rationale of Bonitsis does not apply to the verbal threshold provided by N.J.S.A. 59:9-2d. Contrary to Moss's argument on that issue, the verbal threshold does not bar suit entirely, as does the failure to file a timely notice of claim; the threshold merely limits the recoverable damages. And N.J.S.A. 59:3-14b plainly states that "nothing" in the act *289 "shall exonerate a public employee from the full measure of recovery applicable to a person in the private sector" if the employee has committed acts of "willful misconduct." Thus N.J.S.A. 59:9-2d does not protect Moss, and we affirm the judgment of the Law Division insofar as it holds the verbal threshold inapplicable to Warnebold's claim.
[For purposes of publication, we have omitted the discussion of willful misconduct under N.J.S.A. 59:3-14b. We concluded that Moss's conduct unquestionably constituted willful misconduct, and summary judgment dismissing Moss's Tort Claims Act defense was entirely appropriate.]
Affirmed as to both A-5052 and A-5053.
APPENDIX A
N.J.A.C. 13:35-7.6, enacted by the Board of Medical Examiners, provided as follows prior to the amendment to section c on June 10, 2003:
(a) When prescribing, dispensing or administering controlled substances, a practitioner shall ensure that a patient's medical history has been taken and physical examination accomplished, including an assessment of physical and psychological function, underlying or coexisting diseases or conditions, any history of substance abuse and the nature, frequency and severity of any pain. The medical record shall reflect:
1. A recognized medical indication for the use of the controlled substance;
2. The complete name of the controlled substance;
3. The dosage, strength and quantity of the controlled substance; and
4. The instructions as to frequency of use.
(b) With respect to Schedule II controlled substances, unless the requirements of (c) below are met, a practitioner shall not authorize a quantity calculated to exceed 120 dosage units or a 30-day supply, whichever is less.
(c) A practitioner may exceed the 120 dosage unit limitation for Schedule II controlled substances in (b) above, if the practitioner follows a treatment plan designed to achieve effective pain management which has been tailored to the needs of a patient who is suffering pain from cancer, intractable pain or terminal illness. The treatment plan shall state objectives by which treatment success is to be evaluated, such as pain relief and improved physical and psychological function, and shall indicate if any further diagnostic evaluations or other treatments are planned. The practitioner shall discuss the risks and benefits of the use of controlled substances with the patient, guardian or authorized representative.
(d) When controlled substances are continuously prescribed for management of pain for three months or more, the practitioner:
1. Shall review, at a minimum of every three months, the course of treatment, any new information about the etiology of the pain and the patient's progress toward treatment objectives;
2. Shall remain alert to problems associated with physical and psychological dependence; and
3. Shall periodically make reasonable efforts, unless clinically contraindicated, to either stop the use of the controlled substance, decrease the dosage, try other drugs such as nonsteroidal anti-inflammatories, or treatment modalities in an effort to reduce the potential for abuse or the development of physical or psychological dependence.
(e) If treatment objectives are not being met, the practitioner:

*290 1. Shall assess the appropriateness of continued treatment with controlled substances or undertake a trial of other drugs or treatment modalities; and
2. Shall consider referring the patient for independent evaluation or treatment in order to achieve treatment objectives.
(f) A practitioner shall remain alert to the possibility that controlled substances may be misused or diverted. A practitioner managing pain in a patient with a history of substance abuse shall exercise extra care by way of monitoring, documentation and possible consultation with addiction medicine specialists, and should consider the use of an agreement between the practitioner and the patient concerning controlled substance use and consequences for misuse.
(g) The practitioner shall keep accurate and complete records including that information required by (a) above as well as:
1. The medical history and physical examination of the patient;
2. Other evaluations and consultations;
3. Treatment plan objectives;
4. Evidence of informed consent;
5. Treatments and drugs prescribed or provided, as in (a) above;
6. Any agreements with the patient; and
7. Periodic reviews conducted.
Section (c) was amended effective July 7, 2003, to provide:
(c) A practitioner may exceed the 120 dosage unit or 30-day supply limitations for Schedule II controlled substances in (b) above in the following circumstances:
1. For the 120 dosage unit limitation, the practitioner follows a treatment plan designed to achieve effective pain management which has been tailored to the needs of a patient who is suffering pain from cancer, intractable pain or terminal illness. The treatment plan shall state objectives by which treatment success is to be evaluated, such as pain relief and improved physical and psychological function, and shall indicate if any further diagnostic evaluations or other treatments are planned. The practitioner shall discuss the risks and benefits of the use of controlled substances with the patient, guardian or authorized representative; and
2. With regards to the 30-day supply limitation, a practitioner may prescribe the use of an implantable infusion pump which is utilized to achieve pain management for patients suffering from cancer, intractable pain or terminal illness. A prescription for such an implantable infusion pump may provide up to a 90-day supply as long as the physician evaluates and documents the patient's continued need at least every 30 days.
35 N.J.R. 2935(a); 34 N.J.R. 3441(a).
NOTES
[1] Defendant Albert Moss is represented by two law firms, each of which is defending Moss and pursuing an appeal with respect to claims arising during a separate time period. Prior to March 31, 1999, Moss was employed by a private entity, HIP/Pinnacle Medical Group, and insured under a policy issued by the Medical Inter-Insurance Exchange. The law firm of Sharp & Brown represents Moss with respect to that period (Docket No. A-5052-02T5). As of April 1, 1999, Moss became an employee of the University of Medicine and Dentistry of New Jersey ("UMDNJ"), a public entity. The law firm of Post, Polak, Goodsell, MacNeill & Strauchler represents Moss with respect to liability arising after that date (Docket No. A-5053-02T5).
[2] For purposes of publication, we have omitted our discussion of the first two issues, as noted under Parts II and III of this opinion.
[3] The original complaint against Moss alleging medical malpractice was filed by William Taglieri, as Executor of the Estate of Mark F. Yatrofsky. The Estate has joined in Warnebold's brief, although the February 25, 2003 partial summary judgment in favor of the Estate was not included in Moss's motions for leave to appeal. (We do not address at this time the legal significance of that omission or of the Estate's participation in these appeals). Moss named Warnebold as a third-party defendant, and Warnebold then filed a counterclaim against Moss alleging medical malpractice. It is Warnebold's counterclaim that is the subject of these appeals. Moss also named Taglieri individually and Barry Sherwin as third-party defendants. Moss's third-party complaint was dismissed against Warnebold, and against Sherwin, and those dismissals have not been appealed. Sherwin did not participate in these appeals.

The record before us does not include the disposition of the claims against defendants Eckerd Drugs (the successor to Boyt's Pharmacy) or Prudential Property and Casualty Ins. Co. of New Jersey.
[4] N.J.A.C. 8:65-7.5(a) provides, in pertinent part:

All prescriptions for controlled substances shall be dated as of, and signed on, the day when issued and shall bear the full name and address of the patient, the drug name, strength, dosage form, quantity prescribed, directions for use and the full name, address, proper academic degree or other definitive identification of the professional practice for which he or she is licensed and registration number of the practitioner.
[5] N.J.A.C. 8:65-7.9 provides: "The refilling of a prescription for a controlled substance listed in schedule II is prohibited."

N.J.S.A. 24:21-15a also provides in pertinent part: "No prescription for a Schedule II substance may be refilled."
[6] Narcotic drugs are subject to federal regulation pursuant to the Controlled Substances Act, 21 U.S.C.A. § 801-904. Section 812(b)(2) defines the characteristics of a Schedule II drug, as does N.J.S.A. 24:21-6a. A Schedule II substance is one which "(1) has high potential abuse; (2) has currently accepted medical use in treatment in the United States, or currently accepted medical use with severe restrictions; and (3) abuse may lead to severe psychic or physical dependence." N.J.S.A. 24:21-6a. Opium derivatives and similar synthetic substances are expressly included among Schedule II substances. 21 U.S.C.A. § 812(c); N.J.S.A. 24:21-6c.
[7] As noted in footnote 2 above, the judge also granted summary judgment on liability in favor of the Estate.
[8] Percocet and Tylox are similar drugs. During the period 1997-2000, both drugs included the same quantity of the Schedule II narcotic analgesic oxycodone, combined with different quantities of a non-narcotic analgesic, acetaminophen. In 2001, Percocet became available in several different dosages. See Physicians' Desk Reference (51st-55th eds. 1997-2001). Oxycodone is an opium derivative, similar to morphine. Ibid. See also N.J.A.C. 13:35-7.6.
[9] On July 23, 2001, Warnebold admitted himself to an in-patient detoxification facility for his addiction to narcotics.
[10] The PDR in the relevant years includes the following warning for both Percocet and Tylox:

Oxycodone can produce drug dependence of the morphine type and, therefore, has the potential for being abused. Psychic dependence, physical dependence and tolerance may develop upon repeated administration of [Percoset] [Tylox], and it should be prescribed and administered with the same degree of caution appropriate to the use of other oral narcotic-containing medications. Like other narcotic-containing medications, [Percoset] [Tylox] is subject to the Federal Controlled Substances Act (Schedule II).
[11] The motion judge dismissed Moss's third-party complaint against Warnebold with prejudice.
[12] Although the trial judge referred to "summary judgment on the issue of liability," it is clear from his letter opinion dated January 16, 2003, that he recognized that the questions of proximate cause and damages remained for the jury. What the judge ruled was that by violating the regulations respecting narcotic drug prescriptions, Moss deviated from the standard of care owed to his patient, Warnebold.
[13] N.J.S.A. 59:2-10 protects a public entity from vicarious liability under the same circumstances:

A public entity is not liable for the acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct.
UMDNJ, Moss's public entity employer during a portion of the period when he was prescribing for Warnebold, was not named in the lawsuit, and the issue of vicarious liability therefore is not involved in this appeal.
[14] N.J.S.A. 59:9-2d provides in relevant part:

No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation on the recovery of damages for pain and suffering shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.
[15] Nothing in N.J.S.A. 59:3-14 suggests that "willful misconduct" is to be treated differently than any other conduct that would disqualify a public employee from exoneration otherwise available under the Act, that is, crime, fraud, malice, or conduct outside the scope of the public employment.
[16] N.J.S.A. 59:3-3 provides:

A public employee is not liable if he acts in good faith in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.
[Emphasis added.]
[17] Another reason cited in Bonitsis for requiring a tort claims notice for intentional torts is to give the public entity the opportunity to determine whether to provide a defense and indemnify the employee. Ibid.; see N.J.S.A. 59:10A-1 to-3; N.J.S.A. 59:10-1, -2.